## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LISA SLAWSBY, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>CHAMPION PETFOODS USA, INC. and CHAMPION PETFOODS LP,<br><br>Defendants. | **Case No.**<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff Lisa Slawsby, individually and on behalf of all others similarly situated, by and through her undersigned attorneys, bring this Class Action Complaint against Defendants Champion Petfoods USA, Inc. and Champion Petfoods LP ("Defendants"), for their negligent, reckless, and/or intentional practice of misrepresenting and failing to fully disclose the presence of heavy metals and toxins in their pet food sold throughout the United States, including within the Commonwealth of Massachusetts. Plaintiff seeks both injunctive and monetary relief on behalf of the proposed Class (defined below), including requiring full disclosure of all such substances in its marketing, advertising, and labeling and restoring monies to the members of the proposed Class. Plaintiff alleges the following based upon personal knowledge as well as investigation by her counsel and as to all other matters, upon information and belief. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a class action on behalf of a class consisting of all persons other than Defendants who are residents of Massachusetts who, from April 11, 2012, to the present (the "Class Period"), purchased the Contaminated Pet Foods (as defined herein) for household or business use, and not for resale (the "Class").

2.      Defendants manufacture, market, advertise, label, distribute, and sell pet food under the brand names Acana and Orijen throughout the Commonwealth of Massachusetts and the United States.

3.      Defendants have created a niche in the pet food market by claiming that they make "biologically 'appropriate' pet food- as close to what animals would eat in nature as possible- and producing it using fresh, natural ingredients." They then charge a premium for this purportedly higher-quality food.  The founder of the company, Peter Muhlenfeld, said, "Our core family beliefs are … entrenched in the company, and that is to make the very best food."

4.      Defendants tout that "Biologically Appropriate™ ORIJEN represents a new class of food, designed to nourish dogs and cats according to their evolutionary adaptation to a diet rich and diverse in fresh meat and protein" and that it is "trusted by pet lovers everywhere."

5.      Defendants' packaging and labels further emphasize fresh, quality, and properly sourced ingredients and even declares its pet food has "ingredients we love."

6.      Yet nowhere in the labeling, advertising, statements, warranties and/or packaging do Defendants disclose that the Contaminated Pet Foods (defined herein) contain levels of arsenic, mercury, lead, cadmium and/or BISPHENOL A ("BPA") — all known to pose health risks to humans and animals, including dogs and cats.

2

7. Defendants warrant, promise, represent, label and/or advertise that the Contaminated Pet Foods are free of any heavy metals and/or chemicals like BPA by assuring that the food represents an evolutionary diet that mirrors that of a wolf – free of anything "nature did not intend for your dog to eat."

8. Defendants assert that: "Virtually All Of The Nutrients In Acana Are Natural And Not Synthetic." Defendants make a similar claim to the Orijen Pet Foods in maintaining that that the main source of any nutrient in Orijen is natural.

9. Defendants further warrant, promise, represent, advertise and declare that the Contaminated Pet Foods are made with protein sources that are "Deemed fit for human consumption."

10. Based on the risks associated with exposure to higher levels of arsenic, both the U.S. Environmental Protection Agency ("EPA") and U.S. Food and Drug Administration ("FDA") have set limits concerning the allowable amounts of arsenic at 10 parts per billion ("ppb") for human consumption in apple juice (regulated by the FDA) and drinking water (regulating by the EPA).

11. The FDA has taken action based on consumer products exceeding this limit, including testing and sending warning letters to the manufacturers.[1]

12. Moreover, the FDA is considering limiting the active level for arsenic in rice cereals for infants to 100 ppb. [2]

---

[1] *See*, *e.g.*, Warning Letter from FDA to Valley Processing, Inc. (June 2, 2016). https://www.fda.gov/iceci/enforcementactions/warningletters/2016/ucm506526.htm

[2] FDA, Draft Guidance for Industry: Inorganic Arsenic in Rice Cereals for Infants: Action Level (Apr. 2016),

13.     The Contaminated Pet Foods also contain lead, which is another carcinogen and developmental toxin known to cause health problems. Exposure to lead in food builds up over time. Buildup can and has been scientifically demonstrated to lead to the development of chronic poisoning, cancer, developmental, and reproductive disorders, as well as serious injuries to the nervous system, and other organs and body systems in dogs, cats, and other species.

14.     The Contaminated Pet Foods also contain mercury, which can cause damage to the cardiovascular system, nervous system, kidneys, and digestive tract in pets. Continued exposure can also injure the inner surfaces of the digestive tract and abdominal cavity, causing lesions and inflammation. There have also been reports of lesions in the central nervous system (spinal cord and brain), kidneys, and renal glands.[3]

15.     Finally, the Contaminated Pet Foods contain cadmium which has been observed to cause anemia, liver disease, and nerve or brain damage in animals eating or drinking cadmium. The U.S. Department of Health and Human Services has determined that cadmium and cadmium compounds are known human carcinogens and the EPA has likewise determined that cadmium is a probable human carcinogen.[4]

16.     Despite the known risks of exposure to these heavy metals, Defendants have negligently, recklessly, and/or knowingly sold the Contaminated Pet Foods without disclosing they contain levels of arsenic, mercury, cadmium and lead to consumers like Plaintiff.

---

ttps://www.fda.gov/downloads/Food/GuidanceRegulation/GuidanceDocumentsRegulatoryInformation/UCM493152.pdf

[3] https://wagwalking.com/condition/mercury-poisoning  (accessed April 11, 2018)

[4] https://www.atsdr.cdc.gov/phs/phs.asp?id=46&tid=15  (accessed April 11, 2018)

17.    Additionally, Defendants knew or should have been aware that a consumer would be feeding the Contaminated Pet Foods multiple times each day to his or her pet, making it the main, if not only, source of food for the pet. This leads to repeated exposure of the heavy metals to the pet.

18.    Defendants have wrongfully and misleadingly advertised and sold the Contaminated Pet Foods without any label or warning indicating to consumers that these products contain heavy metals, or that these toxins can over time accumulate in the dog's or cat's body to the point where poisoning, injury, and/or disease can occur.

19.    Defendants' omissions are material, false, misleading, and reasonably likely to deceive the public. This is true especially in light of the long-standing campaign by Defendants to market the Contaminated Pet Foods as healthy and safe to induce consumers, such as Plaintiff, to purchase the products. For instance, Defendants market the Contaminated Pet Foods as "Biologically Appropriate," using "Fresh Regional Ingredients" comprised of 100 percent meat, poultry, fish, and/or vegetables, both on the products' packaging and on Defendants' websites.

20.    Moreover, Defendants devote significant web and packaging space to the marketing of their DogStar® Kitchens, which they tell consumers "are the most advanced pet food kitchens on earth, with standards that rival the human food processing industry."

21.    Defendants state on their website that the Orijen pet foods "feature[] unmatched and unique inclusions of meat, naturally providing everything your dog or cat needs to thrive." Defendants further promise on the products' packaging and on its website that its Orijen and Acana foods are "guaranteed" to "keep your cherished companion happy, healthy, and strong."

22.    Using such descriptions and promises makes Defendants' advertising campaign deceptive based on the presence of heavy metals in the Contaminated Pet Foods. Reasonable

consumers, like Plaintiff, would consider the mere inclusion of heavy metals in the Contaminated Pet Foods as a material fact in considering what pet food to purchase. Defendants' above-referenced statements, representations, partial disclosures, and omissions are false, misleading, and crafted to deceive the public as they create an image that the Contaminated Pet Foods are healthy, safe, and free of contaminants such as arsenic and lead. Moreover, Defendants knew or should have reasonably expected that the presence of heavy metals in its Contaminated Pet Foods is something an average consumer would consider in purchasing dog or cat food. Defendants' representations and omissions are false, misleading, and reasonably likely to deceive the public.

23.    Moreover, a reasonable consumer, such as Plaintiff and other members of the Class (as defined herein), would have no reason to not believe and/or anticipate that the Contaminated Pet Foods are ""Biologically Appropriate" foods that use "Fresh Regional Ingredients" consisting only of meat, poultry, fish, and vegetables. Non-disclosure and/or concealment of the toxins in the Contaminated Pet Foods coupled with the misrepresentations alleged herein by Defendants suggesting that the food provides complete health and is safe, is intended to and does, in fact, cause consumers to purchase a product Plaintiff and members of the Class would not have bought if the true quality and ingredients were disclosed. As a result of these false or misleading statements and omissions, Defendants have generated substantial sales of the Contaminated Pet Foods.

24.    Plaintiff bring this action individually and on behalf of all other similarly situated consumers within the Commonwealth of Massachusetts who purchased the Contaminated Pet Foods, in order to cause the disclosure of the presence of heavy metals that pose a known risk to both humans and animals in the Contaminated Pet Foods, to correct the false and misleading perception Defendants have created in the minds of consumers that the Contaminated Pet Foods

are high quality, safe, and healthy and to obtain redress for those who have purchased the Contaminated Pet Foods.

### Bisphenol A ("BPA")

25.     The dangers of BPA in human food are recognized by the FDA. For instance, manufacturers and wholesalers are prohibited from selling any children's products that contain BPA and any infant formula, baby food, or toddler food stored in containers with intentionally added BPA.

26.     Still, certain Contaminated Pet Foods are sold by Defendants that contain levels of BPA—an industrial chemical that "'is an endocrine disruptor. It's an industrial chemical that according to Medical News Today' . . . interferes with the production, secretion, transport, action, function and elimination of natural hormones.'"[5] BPA has been linked to various health issues, including reproductive disorders, heart disease, diabetes, cancer, and neurological problems.[6]

27.     Despite the presence of this harmful chemical, Defendants prominently warrant, claim, feature, represent, advertise, or otherwise market the Contaminated Pet Foods as made from "Biologically Appropriate" and "Fresh Regional Ingredients" consisting entirely of fresh meat, poultry, fish, and vegetables. Indeed, each bag prominently displays the percentage of these ingredients on the front.

---

[5] Dr. Karen Becker, *A Major Heads Up: Don't Feed This to Your Dog*, Healthy Pets (Feb. 13, 2017), https://healthypets.mercola.com/sites/healthypets/archive/2017/02/13/dogs-canned-food-dangers.aspx

[6] Christian Nordquist, *Bisphenol A: How Does It Affect Our Health?* Medical News Today (May 24, 2017), https://www.medicalnewstoday.com/articles/221205.php

28.    Defendants' website and packaging also warrants, claims, features, represents, advertises, or otherwise markets that its products are natural. In fact, Orijen's slogan is "Nourish as Nature Intended."

29.    In promoting their promise, warranty, claim, representation, advertisement, or otherwise marketing that the Contaminated Pet Foods are safe and pure, Defendants further assure its customers:

> Equipped with state-of-the-art fresh food processing technologies, our DogStar® kitchens feature 25,000 square feet of cooler space, capable of holding over 500,000 pounds of fresh local meats, fish and poultry, plus fresh whole local fruits and vegetables.

> Unmatched by any pet food maker, our ingredients are deemed fit for human consumption when they arrive at our kitchens fresh, bursting with goodness, and typically within 48 hours from when they were harvested.

30.    To this end, Defendants' websites further warrants, claims, features, represents, advertises, or otherwise markets that the Contaminated Pet Foods are manufactured in such a way that would prevent BPA forming by closely monitoring temperatures and quality:

> "[O]ur unique Votator Heat Exchangers bring chilled fresh ingredients to room temperature without introducing water or steam, which enables us to add even more fresh meats into our foods."

> "Referred to as 'the most significant preconditioning development for extrusion cooking in the last 20 years,' our High Intensity Preconditioners were custom-built for DogStar®, feeding fresh meats from the Votators to Extruders at rates previously unheard of, and without high temperatures."

> "At the heart of our kitchens is a twin thermal extruder which is fed fresh ingredients from our High Intensity Preconditioner.

> The first of its kind in North America, it took 11 months to build, and features custom steam injection to enable very high fresh meat inclusions and a gentle cooking process which helps further reduce the carbohydrates in our foods and preserves their natural goodness."

31.    Thus, Defendants engaged in deceptive advertising and labeling practice by expressly warranting, claiming, stating, featuring, representing, advertising, or otherwise marketing on Acana and Orijen labels and related websites that the Contaminated Pet Foods are natural, fit for human consumption, fit for canine consumption, and made from "Biologically Appropriate" and "Fresh Regional Ingredients" consisting entirely of fresh meat, poultry, fish, and vegetables when they contain the non-naturally occurring chemical BPA.

32.    Based on these false representations, Defendants charge a premium, knowing that the claimed natural make-up of the Contaminated Pet Foods (as well as all of the other alleged false and/or misleading representations discussed herein) is something an average consumer would consider as a reason in picking a more expensive dog or cat food. By negligently and/or deceptively representing, marketing, and advertising the Contaminated Pet Foods as natural, fit for human consumption, fit for canine consumption, natural, and made from "Biologically Appropriate" and "Fresh Regional Ingredients" consisting entirely of fresh meat, poultry, fish, and vegetables, Defendants wrongfully capitalized on, and reaped enormous profits from consumers' strong preference for natural pet food products.

33.    Plaintiff brings this action individually and on behalf of all other similarly situated consumers within the Commonwealth of Massachusetts who purchased the Contaminated Pet Foods, in order to cause the disclosure of the presence of BPA that pose a known risk to both humans and animals in the Contaminated Pet Foods, to correct the false and misleading perception Defendants have created in the minds of consumers that the Contaminated Pet Foods are high quality, safe, and healthy and to obtain redress for those who have purchased the Contaminated Pet Foods.

## JURISDICTION AND VENUE

34.    This Court has original jurisdiction over all causes of action asserted herein under the Class Action Fairness Act, 28 U.S.C. §1332(d)(2), because the matter in controversy exceeds the sum or value of $5,000,000 exclusive of interest and costs, the Defendants are not citizens of the Commonwealth of Massachusetts, the District in which the Class resides and in which this case is filed, and therefore any exemptions to jurisdiction under 28 U.S.C. §1332(d) do not apply.

35.    Venue is proper in this Court pursuant to 28 U.S.C. §1391, because Plaintiff resides and suffered injury as a result of Defendants' acts in the Commonwealth of Massachusetts, many of the acts and transactions giving rise to this action occurred in this District, Defendants conduct substantial business in this District, Defendants have intentionally availed themselves of the laws and markets of this District, and Defendants are subject to personal jurisdiction in this District.

## PARTIES

36.    Plaintiff Lisa Slawsby ("Plaintiff") is, and at all times relevant hereto has been, a resident of the Commonwealth of Massachusetts. Plaintiff has been a dog trainer since 2014. Since 2014, she has purchased on average one bag per month of the Contaminated Pet Foods for the dogs she trains and boards. More recently, since December 2017, she has been purchasing 2 bags per month for her dog, Bruce, whom Plaintiff rescued from St. John after Hurricane Irma devastated the island. Plaintiff has also purchased Acana and Orjen dry cat food for her cats.

37.    Plaintiff has purchased the following Contaminated Pet Foods since 2014: Acana Regionals Wild Atlantic with New Wild New England Fish & Fresh Kentucky Greens; Acana Heritage Freshwater Fish Formula Dry Food; Orijen Regional Red Angus Beef, Ranch Raised Lamb, Wild Boar, Pork, Bison Dry Food; Orijen Regional Red with Angus Beef, Wild Boar, Boer

Goat, Romney Lamb, Yorkshire Pork & Wild Mackerel; and Orijen Six Fish with New England Mackerel, Herring, Flounder, Redfish, Monkfish and Silver Hake.

38.     In March of 2018, Plaintiff stopped buying any of the Contaminated Pet Foods because her dog, Bruce, was getting sick from the Contaminated Pet Foods.  Since then, Bruce has recovered his health.

39.     Prior to purchasing the Contaminated Pet Foods, Plaintiff saw the products the nutritional claims on the packaging, which she relied on in deciding to purchase the Contaminated Pet Foods.  During that time, based on the false and misleading claims, warranties, representations, advertisements and other marketing by Defendants, Plaintiff was unaware that the Contaminated Pet Foods contained any level of heavy metals, chemicals or toxins and would not have purchased the food if that was fully disclosed. Plaintiff was injured by paying a premium for the Contaminated Pet Foods that have no or *de minimis* value based on the presence of the alleged heavy metals, chemicals and toxins.

40.     As the result of Defendants' negligent, reckless, and/or knowingly deceptive conduct as alleged herein, Plaintiff was injured when she paid the purchase price or a price premium for the Contaminated Pet Foods that did not deliver what was promised.  She paid the premium price on the assumption that the labeling of the Contaminated Pet Foods was accurate and that it was healthy, superior quality, natural, and safe for dogs and cats to ingest.  Plaintiff would not have paid this money had she known that the Contaminated Pet Foods contained any levels of the heavy metals, chemicals and/or toxins.  Plaintiff was further injured because the Contaminated Pet Foods that have no or *de minimis* value based on the presence of the alleged heavy metals, chemicals and toxins. Damages can be calculated through expert testimony at trial. Further, should Plaintiff encounter the Contaminated Pet Foods in the future, she could not rely on

the truthfulness of the packaging, absent corrective changes to the packaging and advertising of the Contaminated Pet Foods.

41.    Defendant Champion Petfoods USA Inc. ("Champion USA") is incorporated in Delaware. Its headquarters and principal place of business, as of March 2016, is located at 12871 Bowling Green Road, Auburn, KY 42206. Prior to that, its headquarters and principal place of business were located at 11403-186 St NW, Edmonton, Alberta T5S 2W6.

42.    Defendant Champion Petfoods LP ("Champion Canada") is a Canadian limited partnership with its headquarters and principal place of business located at 11403-186 St NW, Edmonton, Alberta T5S 2W6. Defendant Champion Canada wholly owns, operates, and/or controls Defendant Champion USA.

43.    Defendants formulate, develop, manufacture, label, distribute, market, advertise, and sell the Contaminated Pet Foods under the brand names Orijen and Acana throughout the Commonwealth of Massachusetts, during the Class Period.  The advertising, labeling, and packaging for the Contaminated Pet Foods, relied upon by Plaintiff, was prepared, reviewed, and/or approved by Defendants and their agents, and was disseminated by Defendants and their agents through marketing, advertising, packaging, and labeling that contained the misrepresentations alleged herein. The marketing, advertising, packaging and labeling for the Contaminated Pet Foods was designed to encourage consumers to purchase the Contaminated Pet Foods and misled the reasonable consumer, *i.e.*, Plaintiff and the Class, into purchasing the Contaminated Pet Foods. Defendants own, manufacture, and distribute the Contaminated Pet Foods, and created, allowed, negligently oversaw, and/or authorized the unlawful, fraudulent, unfair, misleading, and/or deceptive labeling and advertising for the Contaminated Pet Foods.

## SUBSTANTIVE ALLEGATIONS

**The Contaminated Pet Foods**

44.    The Contaminated Pet Foods include, but are not limited to, the following dog and cat foods:

a.  Acana Regionals Appalachian Ranch with Ranch-Raised Red;

b.  Acana Regionals Wild Atlantic with New Wild New England Fish & Fresh Kentucky Greens;

c.  Acana Heritage Freshwater Fish Formula Dry Food;

d.  Orijen Regional Red Angus Beef, Ranch Raised Lamb, Wild Boar, Pork, Bison Dry Food;

e.  Orijen Regional Red with Angus Beef, Wild Boar, Boer Goat, Romney Lamb, Yorkshire Pork & Wild Mackerel; and

f.  Orijen Six Fish with New England Mackerel, Herring, Flounder, Redfish, Monkfish and Silver Hake.

**Heavy Metals Create Known Risks When Ingested**

45.    Toxins like arsenic, mercury, cadmium and lead can cause serious illness to humans and animals. A company should be vigilant to take all reasonable steps to avoid causing family pets to ingest these toxins.

**<u>Arsenic</u>**

46.    Arsenic is a semi-metal element in the periodic table. It is odorless and tasteless. Arsenic occurs naturally in the environment as an element of the earth's crust; it is found in rocks, soil, water, air, plants, and animals. Arsenic is combined with other elements such as oxygen, chlorine, and sulfur to form inorganic arsenic compounds. Historically, arsenic compounds were

used in many industries, including: (i) as a preservative in pressure-treated lumber; (ii) as a preservative in animal hides; (iii) as an additive to lead and copper for hardening; (iv) in glass manufacturing; (v) in pesticides; (vi) in animal agriculture; and (vii) as arsine gas to enhance junctions in semiconductors. The United States has canceled the approvals of some of these uses, such as arsenic-based pesticides, for health and safety reasons. Some of these cancellations were based on voluntary withdrawals by producers. For example, manufacturers of arsenic-based wood preservatives voluntarily withdrew their products in 2003 due to safety concerns, and the EPA signed the cancellation order. In the Notice of Cancellation Order, the EPA stated that it "believes that reducing the potential residential exposure to a *known human carcinogen* is desirable." (emphasis added) Arsenic is an element—it does not degrade or disappear.

47.    Inorganic arsenic is a known cause of human cancer. The association between inorganic arsenic and cancer is well documented. As early as 1879, high rates of lung cancer in miners from the Kingdom of Saxony were attributed, in part, to inhaled arsenic. By 1992, the combination of evidence from Taiwan and elsewhere was sufficient to conclude that ingested inorganic arsenic, such as is found in contaminated drinking water and food, was likely to increase the incidence of several internal cancers. The scientific link to skin and lung cancers is particularly strong and longstanding, and evidence supports conclusions that arsenic may cause liver, bladder, kidney, and colon cancers as well.

**Lead**

48.    Lead is a metallic substance formerly used as a pesticide in fruit orchards, but the use of such pesticides is now prohibited in the United States. Lead, unlike many other poisons, builds up in the body over time as the person is exposed to and ingests it, resulting in a cumulative exposure which can, over time, become toxic and seriously injurious to health. Lead

poisoning can occur from ingestion of food or water containing lead. Acute or chronic exposure to material amounts of lead can lead to severe brain and kidney damage, among other issues, and ultimately cause death.

49.     The Commonwealth of Massachusetts was one of the first states to regulate lead-based paint.  The Commonwealth defines, under 105 C.M.R. §460, a "Blood Lead Level of Concern" as "a concentration of lead in whole venous blood from 5 to less than 10 micrograms per deciliter in a child younger than six years old" and "Lead Poisoning" as "a medical condition present in a child younger than six years old in which the child has a concentration of lead in whole venous blood of ten micrograms per deciliter or greater."

50.     The FDA has set standards that regulate the maximum parts per billion of lead permissible in water: bottled water cannot contain more than 5 ppb of total lead or 10 ppb of total arsenic. See 21 C.F.R. §165.110(b)(4)(iii)(A).

**Mercury**

51.     Mercury is a known toxin that creates health risks to both humans and animals. The impact of the various ways humans and animals are exposed and ingest mercury has been studied for years. In fact, in as early as 1997, the EPA issued a report to Congress that detailed the health risks to both humans and animals.[7]

52.     Based on the toxicity and risks of Mercury, regulations have been enacted at both the Federal and state level.

---

[7] https://www3.epa.gov/airtoxics/112nmerc/volume5.pdf  (accessed April 11, 2018)

**Cadmium**

53.     Cadmium is likewise a known toxin that creates risk when ingested by animals or humans. It has been specifically noted that "Kidney and bone effects have [] been observed in laboratory animals ingesting cadmium. Anemia, liver disease, and nerve or brain damage have been observed in animals eating or drinking cadmium."[8]

**Defendants Falsely Advertise the Contaminated Pet Foods as Nutritious, Superior Quality, Pure, and Healthy While Omitting Any Mention of the Heavy Metals, as Well as Claim the Foods Are Natural, Pure, and Safe Despite the Inclusion of the Industrial Chemical BPA**

54.     Defendants formulate, develop, manufacture, label, package, distribute, market, advertise, and sell their extensive Acana and Orijen lines of dry and freeze-dried pet food products across the Commonwealth of Massachusetts, including the Contaminated Pet Foods.

55.     Defendants warrant, claim, state, represent, advertise, label, and market their Contaminated Pet Foods as natural, fit for human consumption, fit for canine consumption, and made from "Biologically Appropriate" and "Fresh Regional Ingredients" consisting entirely of fresh meat, poultry, fish, and vegetables; containing "only 1 supplement – zinc;" "provid[ing] a natural source of virtually every nutrient your pet needs to thrive;" and "guaranteed to keep your companion healthy, happy and strong." Defendants therefore had a duty to ensure that these statements were true. As such, Defendants knew or should have known that the Contaminated Pet Foods included the presence of heavy metals and/or BPA.

---

[8] https://www.atsdr.cdc.gov/ToxProfiles/tp5-c1-b.pdf   (accessed April 11, 2018)

56.    Likewise, by warranting, claiming, stating, featuring, representing, advertising or otherwise marketing that Orijen and Acana foods, including the Contaminated Pet Foods, are natural, fit for human consumption, fit for canine consumption, and made from "Biologically Appropriate" and "Fresh Regional Ingredients" consisting entirely of fresh meat, poultry, fish, and vegetables, Defendants had a known duty to ensure that there were no chemicals included in the Contaminated Pet Foods. In fact, Defendants offered further assurances by representing that the quality control over the manufacturing of the Contaminated Pet Foods as a rigid process free of outsourcing.

57.    Defendants specifically promise on their website, "[W]e prepare ACANA ourselves, in our own kitchens, where we oversee every detail of food preparation — from where our ingredients come from, to every cooking, quality and food safety process." Similarly, Defendants promise that their "Dogstar® Kitchens have access to a myriad of specialty family farms, with whom we partner for our supply of trusted ingredients." Finally, Defendants' promise "[s]tandards that rival the human food processing industry for authenticity, nutritional integrity, and food safety." According to the Orijen and Acana websites, Defendants "feature state-of-the-art fresh food processing technologies." As such, Defendants knew or should have known that higher temperatures coupled with the type of containers used in manufacturing create a real risk of BPA in their products.

58.    The Contaminated Pet Foods are widely advertised, and Defendants employ a Chief Marketing Officer, a Vice President for Customer Engagement, and a Director of Marketing in both the United States and Canada.

59.    The official websites for Acana and Orijen display the Contaminated Pet Foods; descriptions and full lists of ingredients for the Contaminated Pet Foods and includes the following promises:

**AWARD-WINNING FOODS AND TREATS**
Biologically Appropriate™ ORJEN represents a new class of food, designed to nourish dogs and cats according to their evolutionary  adaption to a diet rich and diverse in fresh meat and protein.
ORJEN feature unmatched inclusions of fresh free-run poultry, whole nest-laid eggs, whole wild-caught fish and ranch-raised meats – farmed or fished in our region by people we know and trust, and delivered to our kitchens daily so they're brimming with goodness.
Trusted by pet lovers everywhere, award-winning ORJEN foods and treats are guaranteed to keep your cherished dogs and cats happy, healthy and strong!

**AWARD-WINNING BIOLOGICALLY APPROPRIATE™**
OUR MISSION IS CLEAR AND STRONG
We make Biologically Appropriate™ dog and cat foods from Fresh Regional Ingredients and we make them from start to finish in our very own award-winning kitchens.
Our mission represents a new standard in pet food, designed to nourish your dog and cat in two ways.   First, according to its nature evolution to a meat and protein-rich diet. Second, using meats, poultry, eggs and fish that are sustainably ranched, farmed or fished by local suppliers and delivered to our kitchens fresh each day.
We think you'll love ACANA.  More importantly, we think your dogs and cats will too.

60.    Defendants' websites repeat the false and misleading claims, warranties, representations, advertisements, and other marketing about the Contaminated Pet Foods benefits, quality, purity, and natural make-up, without any mention of the heavy metals and/or BPA they contain. This is not surprising given that natural pet food sales represent over $6 billion in the United States and have consistently risen over the years: [9]

---

[9] Statista, *Natural and Organic Pet Food Sales in the U.S. from 2009 to 2019*, The Statistics Portal  https://www.statista.com/statistics/548957/us-sales-of-natural-and-organic-pet-food/ (accessed April 11, 2018)





61.    Moreover, Defendants have themselves acknowledged the importance of quality pet

food to the reasonable consumer:

> "Our No. 1 mandate is BAFRINO – biologically appropriate, fresh regional
> ingredients, never outsourced," said Frank Burdzy, president and chief executive
> officer of Champion Petfoods in Canada, in an interview with the Daily News
> Monday prior to housewarming activities outside and inside the kitchens.
>
> "We build relationships with our suppliers and farms and fisheries. We are trusted
> by pet owners," Burdzy said.

62.    As a result of Defendants' misrepresentations and omissions, a reasonable

consumer would have no reason to suspect the presence of heavy metals and/or BPA in the

Contaminated Pet Foods without conducting his or her own scientific tests, or reviewing third-

party scientific testing of these products.

63.    However, after reviewing third-party scientific testing, it is clear that the

Contaminated Pet Food does in fact contain unsafe levels of both heavy metals and/or BPA.

**Plaintiff's Reliance Was Reasonable and Foreseen By Defendants**

64.     Plaintiff reasonably relied on Defendants' own claims, warranties, representations, advertisements, and other marketing concerning the particular qualities and benefits of the Contaminated Pet Foods.

65.     Plaintiff relied upon Defendants' false and/or misleading representations alleged herein, including the websites and the Contaminated Pet Foods' labels and packaging in making their purchasing decisions.

66.     Any reasonable consumer would consider the labeling of a product (as well as the other false and/or misleading representations alleged herein) when deciding whether to purchase. Here, Plaintiff relied on the specific statements and misrepresentations by Defendants that the Contaminated Pet Foods were natural, fit for human consumption, fit for canine consumption, and made from "Biologically Appropriate" and "Fresh Regional Ingredients" consisting entirely of fresh meat, poultry, fish, and vegetables; "feature[ing] unmatched and unique inclusions of meat, naturally providing everything your dog or cat needs to thrive;" and were "guaranteed" to keep your pet "happy, healthy, and strong" with no disclosure of the inclusion of heavy metals, including arsenic or lead, and BPA.

**Defendants' Knowledge and Notice of Their Breaches of Their Express and Implied Warranties**

67.     Defendants had sufficient notice of their breaches of express and implied warranties. Defendants have, and had, exclusive knowledge of the physical and chemical makeup of the Contaminated Pet Foods.

68.     Additionally, Defendants received notice of the contaminants in their dog and cat food, including the Contaminated Pet Foods, through the Clean Label Project. The Clean Label

Project is a nonprofit 501(c)(3) run by mothers, fathers, pet lovers, consumers and agents of change concerned about the industrial and environmental contaminants in consumer products. The Clean Label Project found higher levels of heavy metals in its dog and cat food products.

69.     Defendants spoke with the Clean Label Project by phone regarding its findings and methodology, which showed that Orijen pet foods have high levels of heavy metals compared to other pet foods. The Clean Label Project informed Defendants that it compared Orijen pet foods to competitors' products and gave them a one-star rating, meaning they contained higher levels of contaminants than other products on the market.[10] Defendants' direct contact with the Clean Label Project demonstrates its knowledge about the Contaminated Dog Foods.

70.     In fact, Defendants actually responded to the Clean Label Project's findings. Defendants' knowledge about the Clean Label Project's findings concerning the Contaminated Pet Foods can be inferred from the Defendants' issuance of a "white paper" concerning heavy metals in pet foods and in opposition to the Clean Label Project findings.[11]

**Privity Exists with Plaintiff and the Proposed Class**

71.     Defendants knew that consumers such as Plaintiff and the proposed Class would be the end purchasers of the Contaminated Pet Foods and the target of their advertising and statements.

---

[10] Clean Label Project, "Orijen: Why Aren't You Listening to Your Customers?" (June 26, 2017) https://web.archive.org/web/20170626025922/www.cleanlabelproject.org/orijen-customers  (accessed on April 11, 2018).

[11] http://www.championpetfoods.com/wp-content/themes/champion-petfoods/res/research/Champion-Petfoods-White-Paper-Heavy-Metals.pdf (accessed April 11, 2018)

72.     Defendants intended that the warranties, advertising, labeling, statements, and representations would be considered by the end purchasers of the Contaminated Pet Foods, including Plaintiff and the proposed Class.

73.     Defendants directly marketed to Plaintiff and the proposed Class through statements on their website, labeling, advertising, and packaging.

74.     Plaintiff and the proposed Class are the intended beneficiaries of the expressed and implied warranties.

## CLASS ACTION ALLEGATIONS

75.     Pursuant to Rules 23(a) and 23(b)(2) and (3) of the Federal Rules of Civil Procedure, Plaintiff brings this action individually and on behalf of all persons who are residents of the Commonwealth of Massachusetts who, from July 1, 2013, to the present, purchased the Contaminated Pet Foods for household or business use, and not for resale.

76.     Excluded from the Class are the Defendants, any parent companies, subsidiaries, and/or affiliates, officers, directors, legal representatives, employees, co-conspirators, all governmental entities, and any judge, justice, or judicial officer presiding over this matter.

77.     This action is brought and may be properly maintained as a class action. There is a well-defined community of interests in this litigation and the members of the Class are easily ascertainable.

78.     The members of the proposed Class are so numerous that individual joinder of all members is impracticable, and the disposition of the claims of the members of all Class members in a single action will provide substantial benefits to the parties and the Court.

79.    Questions of law and fact common to Plaintiff and the Class include, but are not limited to, the following:

(a)    whether Defendants owed a duty of care to Plaintiff and the Class;

(b)    whether Defendants knew or should have known that the Contaminated Pet Foods contained heavy metals;

(c)    whether Defendants knew or should have known that the Contaminated Pet Foods contained BPA;

(d)    whether Defendants wrongfully represented and continue to represent that the Contaminated Pet Foods are natural, fit for human consumption, fit for canine consumption, and made from "Biologically Appropriate" and "Fresh Regional Ingredients" consisting entirely of fresh meat, poultry, fish, and vegetables;

(e)    whether Defendants wrongfully represented and continue to represent that the Contaminated Pet Foods are healthy, superior quality, nutritious and safe for consumption;

(f)    whether Defendants wrongfully represented and continue to represent that the Contaminated Pet Foods are natural;

(g)    whether Defendants wrongfully represented and continue to represent that the Contaminated Pet Foods are pure and safe;

(h)    whether Defendants wrongfully represented and continue to represent that the manufacturing of the Contaminated Pet Foods is subjected to rigorous standards, including temperature;

(i)    whether Defendants wrongfully failed to state that the Contaminated Pet Foods contained heavy metals and/or BPA;

(j)    whether Defendants' representations in advertising, warranties, packaging, and/or labeling are false, deceptive, and misleading;

(k)    whether those representations are likely to deceive a reasonable consumer;

(l)    whether a reasonable consumer would consider the presence of heavy metals and/or BPA as a material fact in purchasing pet food;

(m)    whether Defendants had knowledge that those representations were false, deceptive, and misleading;

(n)     whether Defendants continue to disseminate those representations despite knowledge that the representations are false, deceptive, and misleading;

(o)     whether a representation that a product is healthy, superior quality, nutritious and safe for consumption and does not contain arsenic and/or lead is material to a reasonable consumer;

(p)     whether Defendants' representations and descriptions on the labeling of the Contaminated Pet Foods are likely to mislead, deceive, confuse, or confound consumers acting reasonably;

(q)     whether Defendants violated Massachusetts law;

(r)     whether Defendants willfully and knowingly engage in unfair and deceptive, or fraudulent acts or practices in trade or commerce;

(s)     whether Defendants breached their express warranties;

(t)     whether Defendants breached their implied warranties;

(u)     whether Defendants engaged in unfair or deceptive trade practices;

(v)     whether Defendants engaged in false advertising;

(w)     whether Defendants were unjustly enriched by promising the Class a product that was inherently higher in value than the product that they purchased;

(x)     whether Defendants made negligent and/or fraudulent misrepresentations and/or omissions;

(y)     whether Plaintiff and the members of the Class are entitled to actual, statutory, and punitive damages; and

(z)     whether Plaintiff and members of the Class are entitled to declaratory and injunctive relief.

80.     Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff individually and on behalf of the other members of the Class. Identical statutory violations and business practices and harms are involved. Individual questions,

if any, are not prevalent in comparison to the numerous common questions that dominate this action.

81.     Plaintiff's claims are typical of those of the members of the Class in that they are based on the same underlying facts, events, and circumstances relating to Defendants' conduct.

82.     Plaintiff will fairly and adequately represent and protect the interests of the Class, has no interests incompatible with the interests of the Class, and has retained counsel competent and experienced in class action, consumer protection, and false advertising litigation.

83.     Class treatment is superior to other options for resolution of the controversy because the relief sought for each member of the Class is small such that, absent representative litigation, it would be infeasible for members of the Class to redress the wrongs done to them.

84.     Questions of law and fact common to the Class predominate over any questions affecting only individual members of the Class.

85.     As a result of the foregoing, class treatment is appropriate.

## CLAIMS FOR RELIEF

### COUNT I
### Fraud

86.     Plaintiff incorporates by reference the allegations in the preceding paragraphs.

87.     As set forth above, the Defendants made the following representations to the Plaintiff and Class Members:

    a.  Incorrectly advertising and making false claims that their pet foods were nutritious, superior quality, pure natural, healthy and safe for consumption;

    b.  Falsely claiming that the Contaminated Pet Foods are natural, fit for human consumption, fit for canine consumption, and made from "Biologically Appropriate" and "Fresh Regional Ingredients" consisting entirely of fresh meat, poultry, fish, and vegetables;

    c.  Falsely claiming that the Contaminated Pet Foods contain "only 1 supplement – zinc;"

    d.  Falsely claiming that the Contaminated Pet Foods provid[e] a natural source of virtually every nutrient your pet needs to thrive;"

    e.  Falsely claiming that the Contaminated Pet Foods are "guaranteed to keep your companion healthy, happy and strong;"

88.     As set forth above, the Defendants failed to disclose to Plaintiff and the Class that:

    f.  The Contaminated Pet Foods contained harmful heavy metals and/or BPA;

    g.  The Contaminated Pet Foods were not of superior quality, pure, natural, healthy and/or safe for consumption;

    h.  The Contaminated Pet Foods contain poisonous and deleterious substances rendering them injurious to the health of pets; and

    i.  The composition and quality of the Contaminated Pet Foods fall below and differ from that which their labels purport and represent to process.

89.     The Defendants made the above representations with knowledge of their falsity and/or with utter disregard and recklessness about their falsity such that Defendants' knowledge may be inferred.

26

90.    The Defendants had a duty to disclose the facts about their Contaminated Pet Foods but knowingly concealed such facts from Plaintiff and the Class.

91.    The Defendants made the above representations for the purpose of inducing and intending that the Plaintiff rely thereon and the Plaintiff did rely thereon.

92.    The Plaintiff and the Class were justified in relying on the representations and concealments and did in fact so rely, as would have the ordinary reasonable person.

93.    As a direct result of Defendants' fraudulent conduct, the Plaintiff and the Class were damaged and suffered pecuniary, ascertainable losses by, among other things, failing to receive the qualities and economic value promised to them: a healthy and safe pet food.

## COUNT II
## Fraud by Omission

94.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

95.    Defendants concealed from and failed to disclose to Plaintiff and the Class that their Contaminated Pet Foods contained heavy metals and/or BPA.

96.    Defendants further concealed from and failed to disclose to Plaintiff and the Class that their Contaminated Pet Foods contained chemical ingredients.

97.    Defendants were under a duty to disclose to Plaintiff and members of the Class the true quality, characteristics, ingredients and suitability of the Contaminated Pet Foods because: (1) Defendants were in a superior position to know the true state of facts about their product; (2) Defendants were in a superior position to know the actual ingredients, characteristics, and suitability of the Contaminated Pet Foods; and (3) Defendants knew that Plaintiff and the Class could not reasonably have been expected to learn or discover that the Contaminated Pet Foods

were misrepresented in the packaging, labels, advertising, and website prior to purchasing the Contaminated Pet Foods.

98.     The facts concealed or not disclosed by Defendants to Plaintiff and the Class are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase the Contaminated Pet Foods.

99.     Plaintiff and the Class justifiably relied on the omissions of Defendants to their detriment. The detriment is evident from the true quality, characteristics, and ingredients of the Contaminated Pet Foods, which is inferior than advertised and represented by Defendants.

100.    As a direct and proximate result of Defendants' conduct, Plaintiff and the Class have suffered actual damages in that they have purchased Contaminated Pet Food that is worth less than the price they paid and that they would not have purchased at all had they known of the presence of heavy metals and/or BPA.

101.    Plaintiff and the Class seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

**COUNT III**
**Negligent Misrepresentation**

102.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

103.    Defendants had a duty to Plaintiff and the Class to exercise reasonable and ordinary care in the formulation, testing, formulation, manufacture, marketing, distribution, and sale of the Contaminated Pet Foods.

104.    Defendants breached their duty to Plaintiff and the Class by formulating, testing, manufacturing, advertising, marketing, distributing, and selling a product to Plaintiff that is does not have the ingredients, qualities, characteristics, and suitability for consumption that Defendants'

advertised and by failing to promptly remove the Contaminated Pet Foods from the marketplace or to take other appropriate remedial action.

105.    Defendants knew or should have known that the ingredients, qualities, and characteristics of the Contaminated Pet Foods were not as advertised or suitable for their intended use, consumption by dogs and cats, and was otherwise not as warranted and represented by Defendants. Specifically, Defendants knew or should have known that: (1) the certain of the Contaminated Pet Foods were not natural because they contained levels of the chemical BPA; (2) the Contaminated Pet Foods were not nutritious, superior quality, pure, natural, healthy and safe for consumption because they contained high levels of heavy metals; and (3) and the Contaminated Pet Foods were otherwise not as warranted and represented by Defendants.

106.    As a direct and proximate result of Defendants' conduct, Plaintiff and the Class have suffered actual damages in that they have purchased Contaminated Pet Food that is worth less than the price they paid and that they would not have purchased at all had they known they contained heavy metals and/or BPA.

107.    Plaintiff and the Class seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available.

**COUNT IV**
**Violations of MGL, c. 93A**

108.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

109.    Defendants willfully and knowingly engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the Commonwealth's consumer protection and unfair competition statute, MGL, c. 93A.

110.    Defendants were engaged in trade or commerce as defined by MGL c. 93A.

111.    Defendants violated 940 Mass. Code Regs. §6.04 by making material representations of fact in advertisements that Defendants knew or should have known were false, misleading, had the tendency or capacity to be misleading, or did not have sufficient information upon which a reasonable belief in the truth of the material representations could be based.

112.    Defendants could not substantiate the material representations about the Contaminated Pet Foods before they were made and cannot now substantiate such representations.

113.    Defendants violated 940 Mass. Code Regs. § 3.05 by making claims and representations about, and by failing to disclose additional relevant information about, the Contaminated Pet Foods.  Such acts and failures had the capacity or tendency or effect of deceiving and influencing Plaintiff and the Class.

114.    Defendants' unlawful conduct had the following effects: (1) Plaintiff and the Class paid for a product that was deficient in an objectively identifiable way to the product that was advertised; (2) Plaintiff and the Class were left with a product that was inherently lower in value than the product that was advertised; (3) Defendants were unjustly enriched by obtaining revenues and profits that it would not otherwise have obtained absent their false,  misleading, and/or deceptive acts.

115.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Class have been harmed, and that harm will continue unless Defendants are enjoined from using the misleading marketing described herein in any manner in connection with the advertising and sale of the Contaminated Pet Foods.

116.    Plaintiffs are relieved from any pre-suit demand requirements because Defendants do not have a place of business within the Commonwealth of Massachusetts and/or do not have assets in the Commonwealth of Massachusetts.

117.    Plaintiff and the Class seek treble damages and an award of attorneys' fees.

## COUNT V
### Violations of MGL, c. 266 sec. 91

118.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

119.    Massachusetts' False Advertising Law prohibits the use of advertisements that contain untrue, deceptive, or misleading statements or representations. MGL c. 266 §91.

120.    As set forth herein, Defendants' claims that the Contaminated Pet Foods are nutritious, superior quality, pure, natural, healthy and safe for consumption are literally false and likely to deceive the public.

121.    Defendants' claims that the Contaminated Pet Foods are nutritious, of superior quality, pure, natural, healthy and safe for consumption are untrue or misleading, as is failing to make any mention of heavy metals and/or BPA in the Contaminated Pet Foods.

122.    Defendants knew, or reasonably should have known, that all these claims were untrue or misleading.

123.    Defendants' conduct is ongoing and continuing, such that prospective injunctive relief is necessary, especially given Plaintiff's desire to purchase these products in the future if they can be assured that, so long as the Contaminated Pet Foods are, as advertised, nutritious, superior quality, pure, natural, healthy and safe for consumption and do not contain the heavy metals and/or BPA.

124.    Plaintiff and members of the Class are entitled to injunctive relief.

**COUNT VI**
**Breach of Express Warranty**

125.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

126.    Defendants marketed and sold their Contaminated Pet Foods into the stream of commerce with the intent that the Contaminated Pet Foods would be purchased by Plaintiff and the Class.

127.    Defendants expressly warranted, advertised, and represented to Plaintiff and the Class that their Contaminated Pet Foods are:

> (a) natural, fit for human consumption, fit for canine consumption, and made from "Biologically Appropriate" and "Fresh Regional Ingredients" consisting entirely of fresh meat, poultry, fish, and vegetables;

> (b) contain "only 1 supplement – zinc;"

> (c) nutritious, superior quality, pure, natural, healthy and safe for consumption;

> (d) "provid[e] a natural source of virtually every nutrient your pet needs to thrive;" and

> (e) "guaranteed to keep your cherished companion healthy, happy and strong."

128.    Defendants made these express warranties regarding the Contaminated Pet Foods' quality, ingredients, and fitness for consumption in writing through their website, advertisements, and marketing materials and on the Contaminated Pet Foods' packaging and labels. These express warranties became part of the basis of the bargain Plaintiff and the Class entered into upon purchasing the Contaminated Pet Foods.

129.    Defendants' advertisements, warranties, and representations were made in connection with the sale of the Contaminated Pet Foods to Plaintiff and the Class. Plaintiff and

the Class relied on Defendants' advertisements, warranties, and representations regarding the Contaminated Pet Foods in deciding whether to purchase Defendants' products.

130.    Defendants' Contaminated Pet Foods do not conform to Defendants' advertisements, warranties and representations in that they:

(a) are not natural or suitable for consumption by humans or canines;

(b) contain levels of various heavy metals; and

(c) contain levels of BPA.

131.    Defendants were on notice of this breach as they were aware of the included heavy metals and/or BPA in the Contaminated Pet Foods and based on the public investigation by the Clean Label Product that showed their pet food products as unhealthy.

132.    Privity exists because Defendants expressly warranted to Plaintiff and the Class that the Contaminated Pet Foods were natural, suitable for consumption, and contained only meat, poultry, fish, and/or vegetables, and guaranteed to keep pets healthy, happy, and strong.

133.    As a direct and proximate result of Defendants' conduct, Plaintiff and the Class have suffered actual damages in that they have purchased Contaminated Pet Food that is worth less than the price they paid and that they would not have purchased at all had they known of the presence of heavy metals, and/or BPA.

134.    Plaintiff and the Class seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available thereunder for Defendants' failure to deliver goods conforming to their express warranties and resulting breach.

**COUNT VII**
**Breach of Implied Warranty of Fitness and Merchantability**

135.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

136.    Defendants are merchants engaging in the sale of goods to Plaintiff and the Class.

137.    There was a sale of goods from Defendants to Plaintiff and the members of the Class.

138.    At all times mentioned herein, Defendants manufactured or supplied the Contaminated Pet Foods, and prior to the time the Contaminated Pet Foods were purchased by Plaintiff and the Class, Defendants impliedly warranted to them that the Contaminated Pet Foods were of merchantable quality, fit for their ordinary use (consumption by pets), and conformed to the promises and affirmations of fact made on the Contaminated Pet Foods' containers and labels, including that the food was:

> (a) natural, fit for human consumption, fit for canine consumption, and made from "Biologically Appropriate" and "Fresh Regional Ingredients" consisting entirely of fresh meat, poultry, fish, and vegetables;
>
> (b) contain "only 1 supplement – zinc;" nutritious, superior quality, pure, natural, healthy and safe for consumption;
>
> (c) "provid[e] a natural source of virtually every nutrient your pet needs to thrive;" and
>
> (d) "guaranteed to keep your cherished companion healthy, happy and strong."

139.    Plaintiff and the Class relied on Defendants' promises and affirmations of fact when they purchased the Contaminated Pet Foods.

140.    The Contaminated Pet Foods were not fit for their ordinary use, consumption by pets, and did not conform to Defendants' affirmations of fact and promises as they contained heavy metals and/or BPA at material levels to a reasonable consumer.

141.    The Contaminated Pet Foods that Defendants delivered to Plaintiff and the Class also did not conform to affirmations of fact that they were natural because they contained the industrial chemical BPA.

142.    Defendants breached the implied warranties by selling the Contaminated Pet Foods that failed to conform to the promises or affirmations of fact made on the container or label as each product contained heavy metals and/or BPA.

143.    Defendants were on notice of this breach as they were aware of the heavy metals and/or BPA included in the Contaminated Pet Foods, and based on the public investigation by the Clean Label Product that showed their pet food products as unhealthy.

144.    Privity exists because Defendants impliedly warranted to Plaintiff and the Class through the warranting, packaging, advertising, marketing, and labeling that the Contaminated Pet Foods healthy, natural, and suitable for consumption and by failing to make any mention of heavy metals or BPA.

145.    As a direct and proximate result of Defendants' conduct, Plaintiff and the Class have suffered actual damages in that they have purchased Contaminated Pet Food that is worth less than the price they paid and that they would have not have purchased at all had they known of the presence of heavy metals and/or BPA.

146.    Plaintiff and the Class seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available thereunder for Defendants' failure to deliver goods conforming to their implied warranties and resulting breach.

## COUNT VIII
## Unjust Enrichment

147.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

148.    Substantial benefits have been conferred on Defendants by Plaintiff and the Class through the purchase of the Contaminated Pet Foods. Defendants knowingly and willingly accepted and enjoyed these benefits.

149.    Defendants either knew or should have known that the payments rendered by Plaintiff were given and received with the expectation that the Contaminated Pet Foods would have the qualities, characteristics, ingredients, and suitability for consumption represented and warranted by Defendants. As such, it would be inequitable for Defendants to retain the benefit of the payments under these circumstances.

150.    Defendants' acceptance and retention of these benefits under the circumstances alleged herein make it inequitable for Defendants to retain the benefits without payment of the value to Plaintiff and the Class.

151.    Plaintiff and the Class are entitled to recover from Defendants all amounts wrongfully collected and improperly retained by Defendants, plus interest thereon.

152.    Plaintiff and the Class seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, pray for judgment against the Defendants as to each and every count, including:

A.    An order declaring this action to be a proper class action, appointing Plaintiff and her counsel to represent the Class, and requiring Defendants to bear the costs of class notice;

B.    An order enjoining Defendants from selling the Contaminated Pet Foods until the levels of heavy metals and/or BPA are removed or full disclosure of the presence of such appear on all labels, packaging and advertising;

C.    An order enjoining Defendants from selling the Contaminated Pet Foods in any manner suggesting or implying that they are healthy, natural, and safe for consumption;

D.    An order requiring Defendants to engage in a corrective advertising campaign and engage in any further necessary affirmative injunctive relief, such as recalling existing products;

E.    An order awarding declaratory relief, and any further retrospective or prospective injunctive relief permitted by law or equity, including enjoining Defendants from continuing the unlawful practices alleged herein, and injunctive relief to remedy Defendants' past conduct;

F.    An order requiring Defendants to pay restitution to restore all funds acquired by means of any act or practice declared by this Court to be an unlawful, unfair, or fraudulent business

act or practice, untrue or misleading advertising, or a violation of MGL c. 93A, and such amounts to be trebled, plus pre- and post-judgment interest thereon;

G.    An order requiring Defendants to pay all of Plaintiff's and the Class' attorneys' fees, including the costs of pre-suit investigation, pursuant to MGL c. 93A;

H.    An order requiring Defendants to disgorge or return all monies, revenues, and profits obtained by means of any wrongful or unlawful act or practice;

I.    An order requiring Defendants to pay all actual and statutory damages permitted under the counts alleged herein;

J.    An order requiring Defendants to pay punitive damages on any count so allowable; and

K.    An order providing for all other such equitable relief as may be just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

Respectfully submitted,

**ANDREWS DEVALERIO LLP**

*/s/ Glen DeValerio*
Glen DeValerio (BBO #122010)
Daryl Andrews (BBO #658523)
265 Franklin Street, Suite 1702
Boston, MA 02110
(617) 936-2796
glen@andrewsdevalerio.com
daryl@andrewsdevalerio.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South LaSalle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Email: pdahlstrom@pomlaw.com

**POMERANTZ LLP**
Gustavo F. Bruckner
Gabriel Henriquez
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Email:  gfbruckner@pomlaw.com
            ghenriquez@pomlaw.com

*Attorneys for Plaintiff*